| | | |
|---|---|---|
| United States District Court | | Southern District of Texas |

Port of Houston Authority of Harris § 
County Texas, §
§
        Plaintiff, §
§
*versus* §    Civil Action H-19-746
§
Louis Dreyfus Company Houston Export §
Elevator, LLC, §
§
        Defendant. §

## Memorandum and Order

1. *Background.*

Louis Dreyfus Company Houston Export Elevator, LLC, entered into a ten-year contract with the Port of Houston Authority of Harris County Texas, to lease its grain elevator building. The Port sued Dreyfus for breach of contract because it did not maintain the facility as required under the contract.

This case was tried by a jury from March 22, 2022, through March 25, 2022. Before the jury returned a verdict, Dreyfus moved for judgment as a matter of law, which was denied. The jury returned a verdict that Dreyfus had breached one or more of the provisions of the contract. The instructions allowed the jury to separate damages for each provision that it believed was breached. The jury found that Dreyfus had breached 6.06(a), 6.06(b), and 6.06(c).

The jury awarded:

    $20,522,000 million for 6.06(a);

    $1,500,000 million for 6.06(b); and

    $295,000 for 6.06(c).

On June 3, 2022, this Court entered judgment. One month later, Dreyfus moved for: (a) renewed judgment as a matter of law under Rule 50(b); or (b) a new trial or remittitur under Rule 59(a).

2. *New Trial.*

If the verdict is against the weight of the evidence, the damages are excessive, or the trial was not fair, grounds for a new trial may be appropriate.[1] Dreyfus raised six errors at trial involving testimony by the Port's expert, Jeffrey West, admission of the WJE report, and the Port's estimate of damages. It says these errors were prejudicial and warrant a new trial.

A. *Outside Scope of Knowledge.*

Rule 702 says that a qualified witness may offer specialized or technical opinion evidence when based on (1) sufficient facts or data; (2) reliable principles and methods; and (3) the expert's reliable application of those principles and methods to the facts of the case.[2]

An expert does not always need training in a specific discipline to offer his opinion.[3] The expert is not confined to his area of practice but can testify concerning related applications.[4] Even if a witness is qualified, the expert testimony is admissible only if it is relevant and reliable.[5]

Dreyfus says that West testified outside the scope of his knowledge in these areas: (a) mechanical equipment; (b) electrical equipment; and (c) costs associated with repairs. It argues that West is a self-proclaimed structural engineer. It insists that his experience as a structural engineer makes him ill-equipped to discuss damages for the grain handling and dust control system.

For example, it says that West's testimony that the enclosures around the switch panels needed to be replaced fell outside his area of expertise. It also says that West cannot testify to the cost estimates for repairs because he is not a certified cost estimator.

---

[1] Charles Alan Wright & Victor Gold, Federal Practice and Procedure § 2805 at 68 (2016).

[2] Fed. R. Evid. 702.

[3] Wright & Gold, *supra* note 1, at § 6264.2.

[4] *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-169 (5th Cir. 2013).

[5] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Port does not directly respond to this argument. It insists that the Court has already ruled on West's qualifications and reliability in the Daubert opinion. It did.

In the Daubert briefing, Dreyfus raised the same issue. The Court concluded that West qualified as an expert based on his knowledge, skill, experience, training, and education to testify on the information held in the WJE report. The scope of his testimony is the crux of Dreyfus's objection this time.

Engineering is a broad umbrella with subsets of specialities. The West deposition said that structural engineering deals with static items while mechanical systems deals with machines. Dreyfus does not argue why a structural engineer does not have the general expertise to analyze mechanical engineering work product.

West supervised a team of 18 engineers to produce a report on the condition of the facility. The WJE report was used by West to testify about repairs recommended by his team. His comments on the mechanical and electrical engineering reflected the findings in the report. West can reasonably rely on the findings in the report because he directed and guided the engineers in its production. He is not as far removed as Dreyfus suggests.

Dreyfus's argument that West needs a certificate to testify to the cost of repairs is also unfounded. Certificates of specialization are not a requirement for every expert.[6] Although West is not a cost estimator, he did more than recite numbers from the report. He gave the subcontractor, CCM, guidance on the cost estimates and reviewed the draft reports. West has a solid foundation of the methodology for the source of the numbers based on his supervision of the project.

West's testimony may have been lengthy but it did not prejudice Dreyfus. Dreyfus argues that the jury was prejudiced because (1) West's testimony comprised a majority of the time in trial; and (2) the Port exclusively used West

---

[6] *Huss v. Gayden*, 571 F.3d 442, 455-56 (5th Cir. 2009).

to establish damages. Dreyfus relied on *In re Taxotere* for the proposition that improperly admitted expert testimony that the plaintiff's whole case rests on is prejudicial.[7] The Port distinguished this case because West was not the only witness to testify to damages. For example, the Port called Bill Mullins, Ross McElhinney, and others to testify to repair costs.

Dreyfus's argument fails because the Port relied on more than one witness. West's testimony on other engineering specialities does not warrant a new trial.

### B. "Parroting" Opinion of Others

Rule 703 permits a testifying expert to rely on inadmissible if "the facts and data relied upon are the sort that experts in that field would reasonably rely on."[8]

Dreyfus says that West's "parroting" of opinions by non-testifying experts was inadmissible hearsay. It says that West relied completely on someone else's work in his testimony about the costs for repairs and replacements of: (1) the conveyor belt replacement; (2) drag conveyors; (3) dust collection; and (4) electrical items.

West admits that the information he relied on to testify to mechanical equipment repairs and damages estimates was "someone else's work." Dreyfus harps on this admission to show that West is unqualified because he did not confirm the accuracy of the data on his own. It says that Dreyfus was prejudiced because it was unable to cross-examine the engineers who conducted the analysis first-hand.

The Port reiterates its point from the Daubert challenge that an expert can reasonably rely on the work of others. It says that Dreyfus's argument deals with the weight of the evidence which is preserved for the jury. It says that West's inability to explain portions of the data was properly raised on cross-examination and the jury had the opportunity to assign the weight.

---

[7] *In re: Taxotere (Docetxel) Producted Liab. Litig.*, 26 F.4th 256, 267-69 (5th Cir. 2022).

[8] Fed. R. Evid. 702.

The Court exercised its discretion to control the experts testifying at trial. It was unnecessary for every engineer who worked on the report to testify. West was the lead consultant who led VAA, CCM, and Hatch to compile the report. He said that it is common practice to bring in subject matter experts and rely on their data. Because the facts and data would be justifiably relied upon by other engineers in the field, West was permitted to testify on the contents of the WJE report.

West's testimony was reliable since he lead the team and reviewed the subcontractors' work. Dreyfus had the opportunity on cross-examination to highlight for the jury that West was relying on other non-expert opinions and the jury's interpretation is a matter of weight.

His testimony is also relevant because it examined the condition of the building after the lease expired. It was not prejudicial.

C. *WJE Report.*

Dreyfus says that the WJE report should have been excluded from evidence under Rule 403 because the probative value was not substantially outweighed by prejudice. It argues that the report is hearsay because it is an out-of-court statement that does not fall under the business record exception.

The WJE report is untrustworthy, according to Dreyfus. It insists that the Port knew it was planning to sue Dreyfus when it sent a demand letter in the summer of 2018. Dreyfus suggests that the Port's lawyers requested the commission of the report in preparation of litigation to assess the value of this suit.

Dreyfus says that the Port improperly used the WJE report as an expert report, which is typically prohibited unless the parties agree to admit the expert report. It says that the damages assessment in the WJE report was prejudicial.

The Port argues that the report is admissible because it was created in the regular course of business. It says that the Port's engineering team commissioned the report because the Lanier Survey was too broad. Even if it is

inadmissible under the regular course of business exception, the Port say's that it is admissible as a trustworthy and corroborated report under Rule 807. It says a lawyer's review of evidence does not make a report unreliable.

The business record exception applies when a document has been: (1) made at or near the time of the subject; (2) prepared by a person with knowledge of the subjects recorded; (3) prepared during the course of regularly conducted business activity; (4) a type of document that it was the business's regular practice to make; and (5) retained and kept in the course of regularly conducted business. Documents created in anticipation of litigation do not fall under this exception.[9]

After Dreyfus's lease expired, the Port's engineering team requested the Lanier Survey to assess the condition of the facility. In June 2018, West was hired to create another report after the Port was unsatisfied with the Lanier Survey. In February 2019, the Port sued Dreyfus. Three months later, the WJE report was finalized. The Port's lawyers "reviewed and analyzed" the report before publication.

The Port's request for the Lanier inspection following the lease suggests that this type of assessment on the condition of the facility was in its regular course of business. In West's deposition, he said that the report was not created for purposes of litigation. The Port's corporate representative said that the WJE report was intended to be more comprehensive because the Lanier report was too "high-level." The Port has shown that its engineering team had asked for a review of the condition of the facility before litigation had commenced.

Trustworthiness of the record is a necessary consideration for the court when considering admission for a record under this rule.[10] Whether business records are prepared in anticipation of litigation is a fine-line. It is plausible that eager lawyers may advise businesses to assess detailed damages in preparation for litigation when relationships go awry.

---

[9] *Broadcast Music, Inc., v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988).

[10] Fed. Rules of Evidence 803(6)(e).

The lawyers' review of the report before it was published could raise the question of even so. The lawyers spent almost two hours reviewing a 477 page report. It is unlikely that they would have had time to make the changes that would render the report tainted. It is nevertheless uncanny.

Dreyfus does not have evidence that the lawyers' amended or recommend changes to the report. Even so, the report's findings were corroborated by other testimony, reports, and some of Dreyfus's own repair analysis. It airs on the truthful side.

The last argument raised by Dreyfus is that the breadth of the report's findings was prejudicial. Dreyfus says that the cost of repairs for the next 30 years could have misled the jury.

The jury was handed the full WJE report for completeness. The WJE report included the cost of repairs for the next 30 years but also had priority levels such as "immediate" or "high" for each repair. The Court gave the jury a limiting instruction to count only the repairs required under the lease. The jury could read the damages estimates over the appropriate time frame that it believed was required of the contract.

Dreyfus had the opportunity to present its own competing repair costs. The jury assigned the weight to each of the reports. The WJE report's estimates were not prejudicial because of the limiting instruction.

D.   *Damages Estimate.*

Dreyfus says that the damages evidence does not support the jury's verdict. It says that West's Class 5 estimate had a high degree of variability that merits reversal. It says that the underlying estimates were adjusted and inflated. It says that the jury awarded damages on the upward scale of the Class 5 estimate.

The Port says that the evidence was not prejudicial because the jury instructions explicitly excluded cost escalators and interest. It says that the Court should assume the instructions were followed.

Dr. West's expert report said that: "the total amount of immediate and high priority remedial actions (repair and placement) to address conditions observed for structural elements, grain handling and dust control systems, and electrical and control systems is $12, 382, 990." The Port doubled the number to account for the Class 5 range, which is an estimate established by the Association for the Advancement of Cost Engineering. The range could be as low as $6.15 million or as much as $24.6 million.

At closing, Dreyfus attacked the Class Five estimate accuracy range. It made clear that the range was wide. It is unclear whether the jury understood that interest was included in the Class 5 estimate.

Neither the Port nor Dreyfus can show the exact source of the numbers. Both parties can guess how the jury came up with $20 million for Section 6.06(a) but it is not certain. It is clear, however, that the jury's award falls within the range of the Class 5 estimate.

The Court has already lambasted the Port in Dreyfus's motion for sanctions that the cost estimate range was not transparent from the initial disclosures. Dreyfus, nevertheless, had access to the report and could assess the damages.

It does not warrant a new trial.

E.    Limiting Evidence.

Dreyfus says that the Court erred by rejecting introduction of evidence about the Lansing lease and its tenant's operations. It says that the evidence was relevant because it would have shown that the facility is operating as a grain throughput higher than Dreyfus without the repairs. It insists that this evidence was probative of the condition of the facility and relevant.

The Port says that the Court's two-month relevance window was justifiable to manage the evidence. It says that the condition of the facility during the lease period was the only relevant issue for the breach of contract.

The new tenant, Lansing, had a different lease than Dreyfus. The condition of the new tenant's facility would require the inclusion of the Lansing

lease itself because it had different requirements for upkeep. To avoid the confusion, the Court limited the exhibits to the Dreyfus lease and the condition of the lease during the contract. It was within the Court's discretion.

The time-frame was intended to reduce the mountains of documents. The parties both agreed that it would aid the reduction of evidence. The Court strayed from that rule in narrow circumstances when the evidence was relevant to the condition of the building during the lease – the WJE report. It was not a "blanket rule" as Dreyfus suggests.

While the report estimated the cost of repairs for 30 years, the jury was asked to only consider repairs required under the contract. This instruction, again, limited the time-frame and consideration by the jury. The probative value did not outweigh the prejudice.

F.   *Dreyfus's Repairs.*

Dreyfus says that the Court should not have admitted evidence about repairs that Dreyfus had conducted or considered during the term of the lease. It says that the River Consulting Report considered repairs beyond the lease term. It says that the projected cost of repairs was irrelevant and prejudicial.

The Port says that Dreyfus's own estimates corroborated its report. It says that the documents showed that Dreyfus knew that repairs were necessary to the facility. It says it is relevant because it was contemplated during the term of the lease.

The evidence of contemplated repairs allowed the jury to see how both parties assessed the cost. It also showed that Dreyfus believed that some repairs were necessary. It allowed Dreyfus the opportunity to present competing cost estimates if the jury believed it breached the contract. The jury could then assign the weight of Dreyfus's projected repair costs to the Port's assessment to determine damages.

It was relevant and probative.

3. *Judgment to Support the Jury Verdict.*

A renewed judgment as a matter of law is proper if no legally sufficient basis exists for a reasonable jury to have found for the Port.[11] All reasonable inferences must be drawn in favor of the Port.[12]

A. *Verdict Form.*

Dreyfus says that verdict form does not support entry of judgment on damages. It says that the verdict form did not specify which provisions that Dreyfus breached. It insists that the jury should have been instructed to fill in an amount for damages only if the jury found that the provision had been breached.

The Port says that Dreyfus did not preserve its challenge to separate each provision at issue in the lease. It argues that Dreyfus did not request different wording for Question 1. It is reasonable to conclude that the jury awarded damages where it found a breach, according to the Port.

The jury instructions said that each provision was independent. The damages were separated based on each provision of the lease. If the jury found a breach in Question 1, it put distinct damages in each blank. The jury was instructed that it could not include the same damages in multiple blanks to ensure the distinction between each provision. A reasonable jury could interpret the instructions to award damages in each separate section only if Dreyfus breached that provision of the contract.

Dreyfus does not clearly object to Question 1 until after a verdict. Instead, it insisted on its interpretation of the lease to apply "normal wear and tear" to the entirety of Section 6.06(a) through 6.06(c). It did not request an alternative wording. It waived the challenge to the verdict form by failing to raise it in its objections to the proposed jury instructions.

---

[11] *Ford v. Cimarron Ins. Co.*, 230 F.3d 828, 830 (5th Cir. 2000).

[12] *Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, 337 (5th Cir. 2001)

B.  *Breach of Contract.*

Dreyfus argues that the evidence does not show that Dreyfus breached the lease. It says that the Court erred by interpreting each provision of the lease separately. It insists that under the "correct" interpretation of the lease, the evidence does not support the verdict.

The Port says that Dreyfus is attempting to relitigate the interpretation of the contract. It says that the evidence supports that Dreyfus breached the contract.

This Court rejected the application of 6.06(c) repair standard of "normal wear and tear" for the entirety of section 6.06. Dreyfus preserved its objection to the Court's interpretation of the contract during summary judgment and the verdict form. At this stage, Dreyfus must show that the evidence does not support a verdict under the jury's instructed interpretation of the contract. Reconsideration of the contract interpretation is inappropriate under this procedural posture.

The evidence showed that Dreyfus had a maintenance team to manage the facility. It shows that Lansing, the new tenant, thought that the facility was in "good shape." Dreyfus's own managers believed that repairs should have been done and were not. The Port had sufficient evidence to show that repairs were necessary and Dreyfus breached the contract.

The evidence may not be persuasive to every trier of fact, but it persuaded the jury in this case. A reasonable jury could have found the Port's evidence sufficient.

4.  *Remittitur.*

Remittitur permits a Court to reduce an award of excessive damages where the jury's verdict exceeds the maximum amount recoverable at law.[13] Texas law permits recovery in contract when the loss is the natural, probable,

---

[13] *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1197 (5th Cir. 1981).

and foreseeable consequence of the defendant's conduct. The law allows direct and consequential damages from a breach of contract.[14]

A court should not order remittitur unless the award is so large as to "shock the judicial conscience."[15] The Court may not substitute its own judgment. If the jury's award is based on speculation or guesswork, a remittitur may be proper.

At a minimum, the jury's verdict is supported because the Port's damages included repair costs that arose from direct costs of the failure to maintain the facility during the contract. The issue is whether the damages were too speculative.

Dreyfus says that the Class 5 estimate was too wide a range to support the Port's damages estimate. While the award of the jury is higher than this Court would have awarded, it is not overly speculative.

The jury's verdict fell within the Class 5 range proposed by West. His report explained that the $12,382,990 estimate was a Class 5 estimate, which could vary from 50% less to 100% more than the estimate. This type of estimate was supported by the Association for the Advancement of Cost Engineering. During closing, Dreyfus properly brought this range to the jury's attention. The Port said that the estimated range for damages based on this estimate was from $6 million to $24 million. The jury awarded $22 million in damages. The jury awarded damages within the range.

Dreyfus relies on *Massey* to show that when damages have a high variance without sufficient accuracy or reliability, a new trial is warranted.[16] The Port says this case differs because the challenged expert opinion in that case was based on flawed opinions. In *Massey*, the calculation of damages was

---

[14] *Frost National Bank v. Heafner*, 12 S.W.3d 104, 110 n. 5 (Tex. App.-Houston [1st Dist.] 1999).

[15] *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983).

[16] *Massey v. Gulf Oil Corp.*, 508 F.2d 92, 97 (5th Cir. 1975).

unsupported by the evidence. The WJE report is supported by a team of experts where the variance is industry practice. Although it may have a high variance, it is not a "guesstimate." It is a range.

The jury had the opportunity to weigh the assessment of the WJE report along with the competing Lanier and River Consulting report. It is impossible to dissect the source of the numbers but the damages fell within the range.

Because the jury's damages award was supported by substantial evidence, remittitur is not warranted. The award was within the scope of the evidence presented.

5. Conclusion.

Dreyfus's request for a new trial or remittitur is denied. The renewed judgment as a matter of law is also denied. (196)

Signed on August __17__, 2022, at Houston, Texas.

Lynn N. Hughes
United States District Judge